[No. 13547-1-III.   Division Three.   May 9, 1995.]

PAMELA SHELDON, *Respondent*, v. FRANCINE FETTIG, ET AL, *Petitioners*.

*Scott A. Bruns* and *Dohn, Talbott, Simpson,* for petitioners.

*Frank E. Morris* and *Morris & Church,* for respondent.

SWEENEY, J. — Francine Fettig appeals an order granting summary judgment to Pamela Sheldon. The court determined that Ms. Sheldon had effected valid service of process on Fettig. We granted discretionary review. Fettig contends the

court erred when it concluded that a defendant may have more than one place of usual abode for service of process pursuant to RCW 4.28.080(15).[1] We disagree and affirm the ruling.

### FACTS AND PROCEDURAL POSTURE

On July 15, 1989, Fettig and Sheldon were involved in an automobile accident. On July 9, 1992, 6 days before the expiration of the 3-year statute of limitation, Sheldon filed a damage action against Fettig. On August 7, 1992, a process server, hired by Sheldon, delivered a copy of the summons and complaint to Fettig's 12-year-old brother, at her parents' home in Seattle, 13637 1st Avenue S.W. Whether her brother told the process server that his sister lived at the address is disputed; he maintains that he said she no longer lived there.

On August 19, 1991, Fettig was cited for speeding and reported her address as 13637 1st Avenue S.W. The address on Fettig's Washington driver's license appears to be her Renton address, although she had changed her mailing address to 13637 1st Avenue S.W. after vacating a Renton apartment. When attempting to locate Fettig for purposes of serving process, Sheldon's attorney contacted Fettig's insurer. He was given the telephone number of the Fettigs' Seattle home. Fettig was home when her father and counsel for Sheldon spoke about insurance coverage. Sheldon's attorney could hear her speaking in the background. In December 1991, she moved to Chicago for training as a United Airlines flight attendant.

Her car registration, however, remained in Washington; it listed her parents' Seattle address. Her automobile insurance policy listed her parents' address. Her father later sold the car, at her request. Following the sale of her car, the

---

[1]That statute provides in part:

"The summons shall be served by delivering a copy thereof, as follows:

". . . .

"(15) . . . to the defendant personally, or by leaving a copy of the summons at the house of his usual abode with some person of suitable age and discretion then resident therein."

sales report, dated June 24, 1992, also listed her parents' address. Fettig apparently had her mail forwarded to her parents' home in Seattle, while she was on probationary status with United.

She signed a 1-year lease on a Chicago apartment, along with two other flight attendants, who share the apartment, beginning on February 1, 1992. Both of the other attendants "go home when they can". If Fettig had more than 3 days off, she went "home to Seattle". Once off probationary status, she changed her mailing address to Chicago. On December 22, 1991, she registered to vote in Washington, completing an application which required that she swear she was a Washington resident. She later testified, at deposition, that she had registered at the behest of her best friend's husband. Fettig maintains a current Washington State driver's license. She did not maintain a checking account in the state of Washington but had a savings account she started with her brother about 3 years ago with about a $20 balance. Her father informed her, by telephone, of the lawsuit after she had moved to Chicago.

Fettig's father testified that his daughter stayed at the family home for a 2-month period before she left for Chicago but that since 1989, she had lived in an apartment in Renton. There is no bedroom designated for her in the family home and when she visits she stays overnight at her boyfriend's home. She does store belongings at her parents' home.

On July 15, 1992, the statute of limitation on Sheldon's claim ran. On August 19, 1992, Fettig filed a notice of appearance through her lawyer. On September 15, 1992, she answered the complaint, alleging affirmatively improper service of process and lack of jurisdiction. Fettig subsequently moved for summary judgment based on lack of personal jurisdiction.

The trial court concluded that at the time of service Fettig was a resident of the state of Washington maintaining "two personal abodes; one at 13637 First Avenue S. W. in Seattle, Washington, and the other at an apartment in Chicago,

Illinois". It ruled, therefore, that substituted service at her Seattle address was valid and conferred personal jurisdiction. The court denied Fettig's motion for summary judgment and granted Sheldon's motion to strike the affirmative defense of lack of personal jurisdiction. Fettig filed a motion for discretionary review which we granted.

## DISCUSSION

Several principles of law structure our analysis. First, a standard of review: this is a review from a motion granting summary judgment and review is therefore de novo. *Parkin v. Colocousis*, 53 Wn. App. 649, 653, 769 P.2d 326 (1989). Further, the question presented is one of law (and neither party contends otherwise) — whether Fettig's ties to the Seattle address are sufficient to qualify that residence as "a usual place of abode". *Clingan v. Department of Labor & Indus.*, 71 Wn. App. 590, 592, 860 P.2d 417 (1993) (jurisdiction is a question of law reviewed de novo). Second, a burden of proof: one who asserts a change of residence bears the burden of proof. *Freund v. Hastie*, 13 Wn. App. 731, 734, 537 P.2d 804, *review denied*, 86 Wn.2d 1001 (1975). And finally, a canon of construction: "we so construe the statute as to give meaning to its spirit and purpose, guided by the principles of due process . . .". *Wichert v. Cardwell*, 117 Wn.2d 148, 156, 812 P.2d 858 (1991). While this canon is at odds with the usual notions of statutory construction,[2] it is our Supreme Court's latest pronouncement on the topic and we believe it is more consistent with the aims of our statutory scheme for service of process — notice and due process.

Here, the trial court found, and this record amply supports the finding, that Fettig was a resident of the state of Washington at the time Sheldon attempted to effect service.

---

[2]*In re Estate of Palucci*, 61 Wn. App. 412, 415-16, 810 P.2d 970 (1991) ("Statutes authorizing service by means other than personal service, that is, constructive and substituted service, require strict compliance and must be strictly construed as in derogation of the common law. *See, e.g., Martin v. Meier*, 111 Wn.2d 471, 479, 760 P.2d 925 (1988) (statute covering resident motorists who have departed the state, authorizing service on the Secretary of State); *Painter v. Olney*, 37 Wn. App. 424, 427, 680 P.2d 1066 (service by publication), *review denied*, 102 Wn.2d 1002 (1984).").

The disposition of this case turns on whether the Seattle address can be construed as a "usual place of abode" for Fettig and, necessarily, whether it is possible to have and maintain two usual places of abode. Under the limited facts of this case, we answer both questions in the affirmative.

No Washington case addresses the issue of whether a Washington resident can have two abodes for the purpose of substituted service of process.[3] In personam jurisdiction requires either service on the defendant personally or by substitute service. *Lepeska v. Farley*, 67 Wn. App. 548, 551, 833 P.2d 437 (1992). Substitute service is effected "by leaving a copy of the summons at the house of his *usual abode* with some person of suitable age and discretion then resident therein." (Italics ours.) RCW 4.28.080(15).

The term "place of abode" is not defined by statute. Its use, in this state, in the context of service of process, however, dates back over 140 years. Laws of 1854, § 28(5), p. 136 (substitute service may be made "to some suitable person of the family, above the age of fourteen years, at the dwelling house or usual place of abode of the defendant"); *see Wilbert v. Day*, 83 Wash. 390, 145 P. 446 (1915); *Northwestern & Pac. Hypotheek Bank v. Ridpath*, 29 Wash. 687, 704-06, 70 P. 139 (1902). Although the courts of this state have had occasion to construe the term, there is no hard-and-fast definition of "house of usual abode". *See* Allen E. Korpela, Annotation, *Construction of Phrase "Usual Place of Abode," or Similar Terms Referring to Abode, Residence, or Domicil, as Used in Statutes Relating to Service of Process*, 32 A.L.R.3d 112, 127 (1970). *See also Romjue v. Fairchild*, 60 Wn. App. 278, 282 n.3, 803 P.2d 57 (quoting *Thoenes v. Tatro*, 270 Or. 775, 787, 529 P.2d 912, 919 (1974) (" 'usual place of abode' must be

---

[3]Other state courts have considered this issue and have held that a resident can have more than one abode for service of process. *Capitol Light & Supply Co. v. Gunning Elec. Co.*, 24 Conn. Supp. 324, 190 A.2d 495 (1963); *Van Buren v. Glasco*, 27 N.C. App. 1, 217 S.E.2d 579, 91 A.L.R.3d 820 (1975), *overruled on other grounds by Love v. Moore*, 305 N.C. 575, 291 S.E.2d 141 (1982); *Lavey v. Lavey*, 551 A.2d 692 (R.I. 1988). Other cases support a finding that merely by moving into a new house a defendant does not necessarily prevent her previous dwelling from being her usual place of abode. *See Minnesota Mining & Mfg. Co. v. Kirkevold*, 87 F.R.D. 317 (D. Minn. 1980); *United Bank v. Dohm*, 115 Ill. App. 3d 286, 450 N.E.2d 974 (1983).

taken to mean such center of one's domestic activity . . .")), *review denied,* 116 Wn.2d 1026 (1991); *State v. Haley,* 35 Wn. App. 96, 98, 665 P.2d 1375 (1983) (defining place of abode as "one's home, place of dwelling, residence, and/or domicile"); *Freund v. Hastie, supra* at 734 ("lived in" is the same as place of abode); Black's Law Dictionary 1544 (6th ed. 1990) (person's usual place of abode is the place "where defendant is actually living at time of service . . . place where person would most likely have knowledge of service of process . . .").

In *Wichert v. Cardwell, supra* at 152, our Supreme Court refused to establish a bright-line rule in a case of substituted service, opting instead for "a case-to-case determination" which it concluded was required by "the fact-specific requirements of the statute". The court cited with approval language from *Nowell v. Nowell,* 384 F.2d 951, 953 (5th Cir. 1967), *cert. denied,* 390 U.S. 956 (1968), " '[T]he practicalities of the particular fact situation determine whether service meets the requirements of [Fed. R. Civ. P.] 4(d)(1).' " *Wichert,* at 152. Of particular significance to our inquiry here, the court noted that "the inquiry in any case is upon the method of attempted service, *i.e.,* was it reasonably calculated to provide notice to the defendant?" *Wichert,* at 152. The court also noted that a second important purpose of the statute was the "benefit and protection of parties who have just claims . . .". *Wichert,* at 152. The term "usual place of abode" is used in the statute because it is the place at which the defendant is most likely to receive notice of the pendency of a suit. The term therefore should be interpreted with that purpose in mind.

Recently, in *Romjue v. Fairchild, supra* at 282 n.3, we quoted, with approval, language from the Oregon case of *Thoenes v. Tatro,* 270 Or. at 787:

> We think it is clear that to comport with this standard, "usual place of abode" must be taken to mean such center of one's domestic activity that service left with a family member is reasonably calculated to come to one's attention within the statutory period for defendant to appear.

The court in *Thoenes,* at 787, also noted that "[w]hether a mode of service is 'reasonably likely' to come to defendant's attention is to be judged against the alternative modes of

service practically available." The controlling factor then is not how much time this defendant spends at a given abode, or whether she maintains other residences, but rather whether service at the Seattle address is likely to result in notice to a defendant that she has been sued. Here, the available choices for service in the state of Washington were publication, RCW 4.28.100; service on the Secretary of State, RCW 46.64.040; service at Fettig's previous Renton address (the address still on her Washington driver's license); service at the home of her boyfriend or service at her parents' home. Of these choices, service at her parents' address is actually the most likely to (and, in fact, did) result in notice of the pendency of this suit.

Fettig contends that the trial court erred in determining that a party is capable of two abodes for purposes of effecting substitute service of process, relying on *Dolan v. Baldridge*, 165 Wash. 69, 4 P.2d 871 (1931). There, the Supreme Court defined the term house of usual abode as the place the defendant is actually living at the time of service. *Dolan*, at 74. *Dolan* is distinguishable factually. In *Dolan*, the defendant husband had been transferred to Seattle by his employer. The plaintiff attempted to effect substituted service on him by serving his wife, while she was temporarily in Spokane "to get the furniture". *Dolan*, at 73.

Although Fettig moved to Chicago on December 8, 1991, she registered to vote in Seattle on December 22, 1991, declaring under oath she was a resident of Seattle, Washington. She continues to maintain a valid Washington driver's license. She is not registered to vote in Illinois and has not obtained an Illinois driver's license. She maintains a savings account, a library card and a charge card, all in Seattle.

Young adults transitioning from their parents' home to residences (and lives) of their own maintain more permanent and dependable ties with their parents' home than with residences of their own, during the early stages of that transition. In identifying the "usual place of abode" for an adult child, the choice is, therefore, rarely clear-cut. It is rather somewhere along a sliding scale depending upon the nature and extent of the ties maintained between the child

and the parents' home. At one end of the scale, the parents' home is clearly the usual place of abode. At the other end of the scale, the parents' home is clearly not the usual place of abode. Fettig's situation is a case in point.

She left her parents' home and lived in an apartment in Renton for 2 years. She then moved back with her parents for 2 months before going to Chicago for flight attendant training during which she lived in Chicago in housing provided by United, but continued to use her parents' address as a mailing address. She is now on "reserve" status with United, with the result that she has no regular work schedule. She shares the apartment with two other flight attendants — one from Indianapolis and one from Mississippi. She returns "home" to Seattle but even then spends evenings with her boyfriend, since that relationship began in July of 1992. It would have been difficult, for even the most conscientious of plaintiffs, to effect personal service on her.

In *Romjue*, we recognized that the parental home of an unmarried college student may continue to be a place where substitute service may be made in certain circumstances. *Romjue*, at 282. While Fettig was not a college student, the same principle applies. The most fixed and permanent address in her life was her parents' address.

■ The purpose of the due process rules is to provide due process. *Wichert v. Cardwell*, 117 Wn.2d 148, 151, 812 P.2d 858 (1991). "Compliance with due process is described thusly: 'The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.'" *Wichert*, at 151 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 94 L. Ed. 865, 70 S. Ct. 652 (1950)). Here, service of process at the home of Fettig's parents was a method reasonably calculated to accomplish notice of the action.

The decision of the trial court is affirmed.

THOMPSON, C.J., and SCHULTHEIS, J., concur.

Review granted at 127 Wn.2d 1016 (1995).